DEPARTMENT OF TAXATION, Appellant, v. O. H. KINDT MANUFACTURING COMPANY, Respondent.

*March 8—April 4, 1961.*

For the appellant the cause was argued by *Harold H. Persons,* assistant attorney general, with whom on the brief was *John W. Reynolds,* attorney general.

For the respondent there was a brief and oral argument by *John D. Cahill* of Milwaukee.

CURRIE, J.    The brief of the department states that it was impelled to appeal the result below to this court because of the determination of the circuit court that the instant addi-

tional assessment of income taxes was not the result of an office audit within the meaning of sec. 71.11 (16), Stats.[1] It is pointed out that unless the department had so appealed it would be deemed to have acquiesced in such holding under the provisions of sec. 73.015 (2). This statute provides that, if the circuit court construes a statute adversely to the contention of the department, the department shall be deemed to have acquiesced therein unless it appeals to this court.

Sec. 71.11 (16), Stats., providing for office audits was enacted by ch. 539, Laws of 1927, and numbered sec. 71.10 (5). The same chapter of the session laws also enacted sec. 71.11 (now sec. 71.11 (20)),[2] which provides for field audits of income-tax returns. The department asserts that such statutes were enacted as a result of the decision of this court in *State ex rel. Schuster Realty Co. v. Lyons* (1924), 184 Wis. 175, 197 N. W. 585, 199 N. W. 48. Under the income tax statutes as they then stood in 1924 the terms "audit," "office audit," "field audit," and "field investigation" were not to be found therein. Such statutes did

[1] Sec. 71.11 (16) provides: *"Office audit.* The department of taxation or the assessor of incomes shall as soon as practicable audit each return filed in their respective offices and if it shall be found from such office audit that a person has been over or under-assessed, or if it shall be found that no assessment has been made when one should have been made, the department of taxation or the assessor of incomes shall correct or assess the income of such person. Any assessment, correction, or adjustment made as a result of such office audit shall be presumed to be the result of an audit of the return only, and such office audit shall not be deemed a verification of any item in said return unless the amount of such item and the propriety thereof shall have been determined after hearing and review as provided in sec. 71.12 (1) ; and such office audit shall not preclude the department of taxation or assessor of incomes from making field audits of the books and records of the taxpayer and from making further adjustment, correction, and assessment of income."

[2] Sec. 71.11 (20) reads: *"Verification of return; field audit.* (a) Whenever in the judgment of the department of taxation or assessor

empower the tax commission to require a taxpayer to furnish requested information, and, upon such information, to determine the true amount of taxable income and levy an assessment for the amount of income tax due. The court in that case held that under the statutes as they then existed, if the tax commission had once acted upon facts before it and in the exercise of its best judgment thereon had made an assessment, there was no authorization for it to later change its judgment as to those facts and make a new and different assessment from that originally made.

By reason of the provisions enacted in 1927 for office and field audits, the legislature made it clear that only those additional assessments of tax which were made pursuant to a field audit would foreclose the department from levying further additional assessments for the same tax year. Such intent is apparent from the reading of the last sentence of sec. 71.11 (16), Stats., as set forth in footnote 1 hereof. The learned trial court interpreted the first portion of such sentence as stating a definition of office audit, which portion reads:

---

of incomes it is deemed advisable to verify any return directly from the books and records of any person, or from any other sources of information, the department of taxation or assessor of incomes may direct any return to be so verified.

"(b) For the purpose of ascertaining the correctness of any return or for the purpose of making a determination of the taxable income of any person, the department of taxation or assessor of incomes shall have power to examine or cause to be examined by any agent or representative designated by it, any books, papers, records, or memoranda bearing on the income of such person, and may require the production of such books, papers, records, or memoranda, and require the attendance of any person having knowledge in the premises, and may take testimony and require proof material for their information. Upon such information as it may be able to discover, the department of taxation or the assessor of incomes shall determine the true amount of income received during the year or years under investigation."

"Any assessment, correction, or adjustment made as a result of such office audit shall be presumed to be the result of an audit of the return only, . . ."

Proceeding from such premise, the trial court held that the department was precluded from acting on any information outside of the returns in levying an additional assessment. We quote from the trial court's memorandum decision as follows:

"Reasonable salaries paid by a corporation to its officers are deductible. Assuming such deductions were unreasonable there is no information or facts appearing in an income-tax return which shows the nature, extent, or value of the services rendered by each officer or any of them, and therefore the return would not furnish any basis for a determination of what would constitute a reasonable salary."

The department contends that the statutory words, "Any assessment, correction, or adjustment made as a result of such office audit shall be presumed to be the result of an audit of the return only," were not intended by the legislature to constitute a definition of an office audit. It is at least reasonably arguable that the words, "audit of the return only" were intended solely to distinguish an office audit from a field audit in which the books and records of account of the taxpayer are audited. Under such a construction, any type of audit conducted by the department, short of an inspection made of taxpayer's records to determine the entire liability of such taxpayer for income tax for a particular tax year, would be deemed an audit of the return. Thus the use of information obtained from sources outside of the four corners of the return itself to determine the propriety of a particular deduction, or to establish some item of omitted gross income, would not convert an office audit into a field audit.

We deem that the wording of sec. 71.11 (16), Stats., is ambiguous with respect to whether or not it embodies a definition of office audit. This being true, practical construction of such statute by the department and the board for many years is entitled to controlling weight. *State ex rel. West Allis v. Dieringer* (1957), 275 Wis. 208, 218, 81 N. W. (2d) 533, and *Smith v. Department of Taxation* (1953), 264 Wis. 389, 392, 59 N. W. (2d) 479.

With respect to such issue of practical construction, the brief of the department asserts that for more than thirty years the department, its predecessor tax commission, and the several assessors of income, have conducted office audits of thousands of returns in which resort has been made to data in the office not contained in the return. We also attach to this opinion an appendix which sets forth 22 illustrations of types of information outside of the income-tax returns which the department has been in the practice of utilizing in making office audits. The taxpayer has not challenged the accuracy of these facts, although it does question the right of the department to make use of the same on this appeal because not made a part of the record. However, we consider that it is proper for us on this appeal to take judicial notice of facts disclosed by the department's files.

An illustration of practical construction on the part of the board is afforded by its decision in *Carroll Packing Co. v. Department of Taxation* (1949), WBTA Docket No. I-979. Under the facts of that case, the department in 1944 requested the taxpayer to supply information justifying deductions for depreciation shown in its 1942 and 1943 income-tax returns, such depreciation having been therein computed at two per cent per annum. In response to such request the taxpayer brought its books of account to the department's office to justify such depreciation. Subsequent-

ly in 1947 the department conducted a field audit of the taxpayer's books and records and notified taxpayer of an additional assessment of income taxes. Included in the items forming the basis of such additional assessment was the disallowance of certain business losses deducted in the 1942 and 1943 returns. The taxpayer, in the subsequent hearing before the board arising out of such assessment, contended that, because the books had been exhibited to the department in 1944 with respect to the items of depreciation for the years 1942 and 1943, such years were closed to further assessment. Thus the point at issue was whether the 1944 audit was an office audit or a field audit. The board held that the differences between office and field audits were not specifically spelled out in the statutes. It was further determined that an office audit is not converted into a field audit simply because a taxpayer produces his books or records in the department's office in an attempt to support a particular item appearing in the return. The conclusion reached was that there had not been a field audit made in 1944.

Because of the practical construction of the statute by the department and the board we are of the opinion that, in conducting an office audit of a return, the department may properly consider data outside of that disclosed within the four corners of the return.

The taxpayer advances the argument that, even if this be the law, the procedure followed by the department in the instant case did not constitute an audit of any kind. Its brief points out that the word "audit" was defined in *Travelers Ins. Co. v. Pierce Engine Co.* (1909), 141 Wis. 103, 106, 123 N. W. 643, and such definition was recently quoted with approval in *Grob v. Nelson* (1959), 8 Wis. (2d) 8, 14, 98 N. W. (2d) 457, as follows:

" 'The word "audit" is sometimes restricted to a mere mathematical process, but generally is extended to include

the investigation, weighing of evidence, and deciding wheth-
er items should or should not be included.' "

It is contended that the disallowance in each of the two
years of $5,000 of the total of $75,000 deducted for officers'
salaries was neither the result of a "mathematical process" or
the "weighing of evidence." We agree that it was not the
result of any mathematical process. On the other hand, such
disallowance was based on evidence, viz., the "abstracts"
received from the bureau of internal revenue plus the in-
formation contained in the reports of the federal audit fur-
nished by the taxpayer to the department. It is true that
neither such abstracts, nor the federal audit reports, would
have any probative value as evidence in a court trial, or ad-
ministrative-agency hearing, to establish the unreasonable-
ness of the salaries paid by the taxpayer to its officers.
However, this court is not prepared to lay down an arbitrary
rule that no office audit by the department may be grounded
upon data or information in its possession which would not
technically be admissible as evidence in a lawsuit, or which
would not support a finding by an administrative agency.
However, there is a deterrent to the department's levying
unfounded assessments as a result of office audits, where
reliance is placed on such type of data. Such deterrent is
the realization by the department that, if the taxpayer should
obtain a hearing before the board and present evidence to
sustain his position, it then will be required to substantiate
the assessment by competent evidence or the assessment will
be voided.

Therefore, it is our conclusion that in the instant case an
office audit was made by the department with respect to the
deductions taken for officers' salaries in the two tax years
in question.

We turn now to the remaining issue of whether there is
"substantial evidence in view of the entire record as sub-

mitted" to support the finding of the board that the amounts paid as salaries to the taxpayer's officers were reasonable. Sec. 227.20 (1) (d), Stats. The department points out that the burden of proof is upon the taxpayer in cases of this kind to show the incorrectness of the additional assessment. *Laabs v. Tax Comm.* (1935), 218 Wis. 414, 424, 261 N. W. 404, and *H. G. Weber & Co. v. Department of Taxation* (1946), III WBTA 114. However, we fail to see how the question, of who has the burden of proof, is of any materiality on this appeal.[3] It would only be material where either the taxpayer or the department, or both, had failed to present any evidence on the issue of reasonableness. This is because, where competent evidence is introduced by both the taxpayer and the department before the board on the issue in controversy, the reviewing court is only concerned with whether there is substantial evidence in view of the entire record to sustain the board's finding.

The taxpayer is a Wisconsin corporation having its office and plant in the city of Milwaukee, and is engaged in the manufacture and sale of millwork and cabinetwork. It is a family-owned corporation. The three officers are Albert C. Kindt, president; Gustav Kindt, vice-president; and Erwin Niedermeier, secretary-treasurer. The two Kindts are brothers and Niedermeier is their brother-in-law. The corporation had 38 employees in 1953, and 39 in 1954. Further facts brought out at the hearing before the board are ably summarized in the trial court's memorandum decision as follows:

---

[3] While *Gauger v. Hintz* (1952), 262 Wis. 333, 55 N. W. (2d) 426, is not a tax case, it did involve the reasonableness of corporate officers' salaries and the question of who carried the burden of proof. It was there held that the presentation of rather meager evidence on the issue of reasonableness was sufficient to meet the burden of proof.

"There is evidence that the officers in question did not work a forty-hour week. They worked long days, nights, Saturdays, and Sundays. The president and vice-president invented, designed, and built a machine which end and edge glued boards one at a time. They wished to increase its capacity so that more boards could be so glued at one time. They employed another firm to do this but the result was a failure. They then, in addition to all other work, did the job themselves and produced the machine which does 10 at a time and thereby increased this production 900 per cent. Photographs are in the record showing this machine and its products. Prior to this major and important accomplishment 25 per cent of the lumber purchased was lost as waste. The machine saves 20 per cent of this waste.

"The machine also enables the respondent to use a much-larger percentage of less-expensive wood. There is evidence which permits of a conclusion that the growth and the increased volume of business is traceable to this machine and the savings it effects in the operation of the business. These officers received nothing from the corporation for inventing, designing, and building this machine other than their salaries. After 1949 the corporation paid no dividends. The profits were devoted to expansion. The cost of the machine was paid out of profits, and in 1952 an addition to the plant was built at a cost of $220,000 and partly financed out of profits. Millwork requires exact measurements which must be made on the job. This work was done by the secretary and one of the other officers. As the production volume increased, the secretary who acted as salesman increased his efforts and found outlets for the production. He was subject to call by contractors at night and on Saturdays and Sundays. All of these officers had many years of experience with the corporation. During 1953 and 1954 the corporation

was realizing the benefits from the enlargement of the plant and particularly the increase in savings and production by the machine.

"There was evidence that a large number of millwork companies in the area had ceased operations and no evidence that any others still in business had increased in growth comparable to the respondent.

"The petitioner [the department] offered exhibits showing percentages of salaries to volume of sales, book profit after taxes, and book profit after salaries in other companies, only one of which was located in Milwaukee and in somewhat the same business. There was no proof as to what, if any, services other than the usual and customary duties of officers, the officers of the other companies contributed.

"The percentages were not alike in any two companies. The percentages were higher in the respondent than any of the others. If the officers of companies of like business and size received less salaries for like services then a finding that the salaries were unreasonable would have been warranted.

"The board was confronted with the question as to whether the extraordinary services performed by these officers made the salary deductions reasonable. The so-called 'take-home pay' is just as important to salaried officers as it is to wage earners. It had the right to and probably did take into consideration what these officers could take home after state and federal income taxes.

"If $70,000 was reasonable without taking into consideration these extraordinary services, then it would seem there was a basis for a finding that $75,000 was reasonable taking into consideration such extraordinary services."

In view of the foregoing resumé of the pertinent evidence, we have no hesitancy in determining that the trial court properly found that there was substantial evidence, in considering the entire record as a whole, to sustain the crucial

finding of the board with respect to the reasonableness of the officers' salaries.

*By the Court.*—Judgment affirmed.

## APPENDIX.

*Illustrations of Types of Outside Information Customarily
Used by the Department in Conducting Office Audits
of Income-Tax Returns.*

(1) Through personal knowledge an auditor knows that a deduction taken for dependents is unsupportable, or a federal field audit abstract may show a claimed dependency deduction has been disallowed. The deduction taken is disallowed by the department and a resulting additional assessment made.

(2) Personal knowledge of an auditor, or information in the office, renders a deduction, such as a head-of-the-household deduction, subject to question. Taxpayer is notified to furnish supporting information. If none is supplied or the information supplied does not support the deduction, it is disallowed.

(3) The property division of the department regularly receives information from the registers of deeds as to transfers of real property. It sends out forms to both the seller and the purchaser inquiring as to the details of the transaction. This is supplied to the income-tax division. It is checked against the sale price and the taxpayer's cost as shown in his return. If a different capital gain or loss results than reported, adjustments are made accordingly.

(4) Resort to the information last mentioned shows taxpayer has a capital gain, although he may not have included anything in his return relative to a sale of property. The office audit includes this in his taxable income.

(5) Information furnished to the department by the public service commission relative to changes in depreciation of utility assets will result in different taxable income than set forth in the return.

(6) A bad-debt deduction claimed in a taxpayer's return is disallowed where resort to the income-tax return of the debtor, or inquiry directed to the debtor, shows he is able to pay.

(7) In a return a deduction is taken for Wisconsin income taxes paid. Resort to records or information in the office shows that the additional assessment of said taxes of a prior year is being contested and that the amount reported as taxes paid includes the amount of the deposit with the state treasurer for the contested taxes, which under the law are not deductible in the year of deposit. The office audit disallows the deduction.

(8) Information is obtained by letter or telephone to the clerk of circuit court relative to alimony and support payments and is used in checking such items in returns. Similar information is obtained from public-assistance authorities. Any discrepancies between the return and the facts as thus obtained are made the basis of an office-audit additional assessment.

(9) Reference to the returns in the office of other taxpayers discloses incomes which the taxpayer should have reported but did not. Additional office assessment made based thereon.

(10) Clipping services furnish newspaper items from which information as to marriages, divorces, and other matters pertaining to exemptions and residence claims, is used in office audits. Upon the basis of the information thus obtained many office-audit additional assessments are made.

(11) Corporations doing business in the state are required to file Forms 8 showing all transfers of capital stock to

Wisconsin residents during the year. These reports are used in office audits for checking to ascertain if dividends are reported that should be included in taxable income, and if not, an additional assessment is made.

(12) In residence-question cases, letters of inquiry are sent to the taxpayer and to others, such as municipal officers, to check as to voting and poll lists, as respect to residence. The responses received are used extensively as the basis for additional office-audit assessments.

(13) Returns of partnerships in which a taxpayer is a partner are on file and supply information used in auditing the returns of the partners.

(14) Filed returns of corporations in which the taxpayer is an officer or employee, furnish information used extensively in auditing returns of officers and employees.

(15) Inquiry by telephone to the motor vehicle department as to registration of automobiles furnishes information used in office auditing of returns.

(16) Frequently a field audit has been made of the corporation income-tax liability for the same period covered by the individual returns of officers and directors of the corporation. This furnishes determinative data used in the office audits of these individual taxpayers' returns.

(17) Inquiry of county courts by letters or telephones as to inventories and accounts in estates furnishes information as to income-tax cost of property which is used in office audit of individuals and also of fiduciaries.

(18) In the office auditing of returns, so-called "spot checks" are made of deductions and other items in taxpayer's return. A letter is sent to the taxpayer asking that information be supplied to support a questioned item. If no response is received after reasonable requests, or if the response does not sustain the deduction, the item is disallowed or readjusted.

(19) Letters, telephone calls, and personal contacts by relatives, employees, and other persons, supply information respecting a taxpayer's income tax. The objective of these tipsters or informers often is to see that the taxpayer pays his proper tax, but frequently the motivation is otherwise. The information is forwarded to the office where the taxpayer's return is filed and is used upon office audit thereof.

(20) Gift-tax returns contain information used to check the income-tax cost in the tax return in reporting gain or loss upon subsequent sale of such stock or property. The income-tax-return form is keyed to gifts made during the year and the filing of gift-tax reports for this purpose.

(21) Resort to a previous.field audit of the same taxpayer of prior years. Illustrative would be where the life of an asset was adjusted from ten to twenty years and allowable depreciation reduced accordingly. If in a subsequent year's return the depreciation deduction was continued on the same ten-year life basis, the office audit would readjust the depreciation deduction accordingly.

(22) Resort to Form 9 required to be filed by each employer showing wages and salaries paid and Forms 9B reporting all dividends, interests, rentals, and royalties paid. These are checked against the returns of the individuals named in these forms and adjustments made by office audits accordingly.